# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

GOLDEN OPPORTUNITIES, LLC.,

　　　　　Third-Party Plaintiff/
　　　　　Counter Defendant,

vs.

KUCHENBECKER EXCAVATING,
INC. and H&S FARMS – LIVESTOCK,
LLC,

　　　　　Third-Party Defendants/
　　　　　Counter Claimants.

No.　C23-3046-LTS-KEM

**MEMORANDUM OPINION
AND ORDER ON THIRD-PARTY
DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

## I.　INTRODUCTION

This case is before me on a motion (Doc. 95) for partial summary judgment filed by third-party defendants Kuchenbecker Excavating, Inc. (KE), and H&S Farms – Livestock, LLC (H&S) (collectively, defendants).　Third-party plaintiff Golden Opportunities, LLC (Golden Opportunities), has filed a resistance (Doc. 100) and defendants have filed a reply (Doc. 101).　Oral argument is not necessary.　*See* Local Rule 7(c).

## II.　PROCEDURAL HISTORY

On November 15, 2023, the original plaintiff in this case, Carel Hanekom, filed a complaint asserting numerous claims against Golden Opportunities, KE and H&S, as well as Kenneth Kuchenbecker and Heather Smidt in their individual capacities, arising out of Hanekom's H-2A visa status.　Doc. 1.　On February 13, 2024, Hanekom amended the complaint.　Doc. 40.　The amended complaint contained the following claims:

- Count 1: Breach of Contract (against KE and H&S)

- Count 2: Quantum Meruit (against KE, H&S, Kenneth Kuchenbecker and Heather Smidt)

- Count 3: Unjust Enrichment (against KE, H&S, Kenneth Kuchenbecker, Heather Smidt and Golden Opportunities)

- Count 4: RICO Section 1962(c) (against KE, H&S, Kenneth Kuchenbecker and Heather Smidt)

- Count 5: RICO Section 1962(d) (against all defendants)[1]

- Count 6: Violation of Iowa Code § 91A.3(1) for Failing to Pay Wages Due (against KE and H&S)

- Count 7: Common Law Fraud- Fraudulent Misrepresentation (against all defendants)

Doc. 40.

Only three of these claims included Golden Opportunities: unjust enrichment (Count 3), RICO Section 1962(d) (Count 5) and fraudulent misrepresentation (Count 7). Hanekom asserted an unjust enrichment claim against Golden Opportunities, alleging that a benefit was conferred on Golden Opportunities in the form of "profit" obtained from KE and H&S from fees charged, and that Golden Opportunities "knew and appreciated the financial benefit by being a co-conspirator and facilitator in preparing and submitting, for a profit, temporary employment certification applications knowing they contained false information about material terms." Doc. 100-2 at 4 ¶ 19. Hanekom asserted a RICO claim against Golden Opportunities, alleging that all defendants "knew of, agreed, and conspired to violate 18 U.S.C. § 1962(d)," "jointly shared among themselves profits from the employment of Plaintiff as a H-2A worker instead of a trucking worker under an H-2B visa," "jointly and intentionally conspired and agreed to directly or indirectly conduct the affairs of the enterprise through a 'pattern of racketeering activity,'" and that

---

[1] The complaint also contained allegations against "Steve Roberson" who plays no relevant part in the current proceedings. Doc. 100-2 at 3 ¶ 16.

2

all defendants "jointly knew that their predicate acts were a part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme described above," with "knowledge of the essence or essential nature of the plan and knowingly facilitated the activities undertaken by...the Defendants." *Id.* at 4-5 ¶ 20.

Finally, Hanekom asserted a fraudulent misrepresentation claim against Golden Opportunities, alleging that misrepresentations were made "concerning the wages to be paid to Plaintiff, the provision of meals as well as kitchen services to be supplied to Plaintiff, the type of work Plaintiff would be performing, the locations where Plaintiff would be working, and the locations where Plaintiff would be housed," and asserted the representations were made "with the intent to defraud USDOL into approving H-2A job orders and to induce Plaintiff to accept the job." *Id.* at 5 ¶ 21. Golden Opportunities denied these allegations. *See id.* at 4-5 ¶¶ 19-21.

KE, H&S, Kuchenbecher and Smidt resolved their claims with Hanekom on April 17, 2024. Doc. 64. On June 12, 2024, this court denied Golden Opportunities' motion (Doc. 43) to dismiss the amended complaint. Doc. 68. On September 23, 2024, Golden Opportunities filed a third-party complaint against KE and H&S (collectively, defendants), alleging claims for indemnification (Count 1) and breach of contract (Count 2) against defendants. Doc. 81. Golden Opportunities argues that it was subjected to Hanekom's claims as a direct result of work performed for defendants pursuant to agency agreements and defendants' misuse of H-2A workers and thus seeks indemnification from Hanekom's claims and the attorney fees and costs of pursuing KE and H&S for their breach of contract. Doc. 100-3 at 9 ¶¶ 71, 72.[2]

---

[2] Defendants answered Golden Opportunities' third-party complaint on October 14, 2024, and asserted counterclaims against Golden Opportunities for negligence, negligent misrepresentation, breach of contract and breach of fiduciary duty. Doc. 84. Neither party has moved for summary judgment on those claims. *See* Doc. 95-2 at 3. As such, this order addresses only Golden Opportunities' third-party claims against defendants.

Golden Opportunities resolved its claims with Hanekom on November 6, 2024. Doc. 86. Trial is set to begin October 14, 2025.

### III.    SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id*. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id*.

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248–49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of

4

a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).

## IV.   RELEVANT FACTS

This case involves defendants' allegedly fraudulent use of the H-2A visa program to recruit Hanekom to Iowa to work, and Golden Opportunities' assistance with that process. Golden Opportunities characterizes defendants as fraudsters who are "running from the consequences" of their actions by denying that Golden Opportunities' involvement in the H-2A program was innocent. *See* Doc. 100-1 at 12. Defendants characterize Golden Opportunities as a knowing participant in the acts that gave rise to Hanekom's complaint. Doc. 95-2 at 3.

Because the parties dispute many of the relevant facts, I will recount the facts submitted by the parties below, viewing the record in the light most favorable to Golden Opportunities as the non-moving party.[3]

## A.     The Parties and H-2A Program Requirements

KE is an Iowa corporation that is owned by Kenneth Kuchenbecker (Kenny) and Sara Kuchenbecker (Sara).  Doc. 100-2 at 1 ¶¶ 1-3.  KE was incorporated in 2003.  Doc. 100-3 at 1 ¶ 1.  H&S is an Iowa LLC that is owned by Heather Smidt and Sara.  Doc. 100-2 at 1-2 ¶¶ 4-5.  Smidt is the daughter of Kenny and Sara.  *Id.* at 2 ¶ 6.

Golden Opportunities is a Tennessee LLC that assists American employers with finding and retaining temporary workers under the H-2A visa program.[4]  Doc. 95-4 at 5; Doc. 100-2 at 2 ¶ 9.  The H-2A visa program is designed for employers to recruit foreign workers if these employers can show that they engage in agriculture-related business, that they are unable to find local workers for necessary jobs, that they carry appropriate workers compensation insurance, that employing H-2A workers will not adversely affect the wages and working conditions of similarly employed United States workers and that the required work is of a temporary or seasonal nature.[5]

---

[3] As part of its resistance to defendants' motion for summary judgment, Golden Opportunities included a statement of additional material facts.  Doc. 100-3.  Defendants failed to reply to this statement of additional material facts as required by Local Rule 56(d).  As such, those facts will be deemed admitted.  *See* Local Rule 56(d) ("The failure to reply to an individual statement of material fact with appropriate appendix citations may constitute an admission of that fact.").

[4] Golden Opportunities was previously located in Iowa but is now located in Tennessee.  Doc. 100-2 at 2 ¶ 10.

[5] *See H-2A Temporary Agricultural Workers,* U.S. CITIZENSHIP AND IMMIGRATION SERVICES, https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2a-temporary-agricultural-workers (last updated Jan. 17, 2025).  Pursuant to Federal Rule of Evidence 201(b)(2), I may take judicial notice of the H-2A visa program's regulatory scheme.  *Klossner v. IADU Table Mound MHP, LLC,* 565 F. Supp. 3d 1118, 1123 (N.D. Iowa 2021) (citing *Roemer v. Bd. Pub. Works,* 426 U.S. 736, 742 n.4 (8th Cir. 1994); *Norambuena v. Western Iowa Tech Community College,* 773 F. Supp. 3d 628, 641 n.4 (N.D. Iowa 2025); *Newcomb v. Brennan,* 558 F. 2d 825, 829 (7th Cir. 1977).

Gabriel Oosthuysen is Golden Opportunities' Program Director. Doc. 100-2 at 3 ¶ 11. He began working for Golden Opportunities in 2009. Doc. 100-3 at 2 ¶ 7. Golden Opportunities designated Oosthuysen as an expert in the H-2A process and has disclosed a report he authored about that process, as it related to KE's application. Doc. 100-2 at 3 ¶ 12; Doc. 95-4 at 3. Oosthuysen has a bachelor's degree in accounting and finance from Drake University and a Master of Business Administration from Upper Iowa University. Doc. 100-2 at 3 ¶ 13. Hanekom, the original plaintiff in this action, is a South African national who was recruited to work for KE and H&S with the assistance of Golden Opportunities. *Id.* ¶ 14.

### B. The Parties' Contractual Agreements

Golden Opportunities and KE signed agreements outlining the services Golden Opportunities would provide each year that the parties worked together. *Id.* at 6 ¶ 26. H&S followed this same procedure with Golden Opportunities. *Id.* ¶ 27. The agreements were identical with the exception of the names of the parties, with Kenny signing as an owner of KE and Smidt signing as an owner of H&S. *Id.* ¶ 28; Doc. 95-3 at 46, 53. Each contract contains a supremacy clause. Doc. 100-2 at 6 ¶ 29. The last contracts were signed in 2022 (H&S) and 2023 (KE).[6] *Id.* at 7 ¶ 30.

Each agreement signed by the parties through the years contained an indemnification clause. *Id.* ¶ 31. The indemnification clause changed in the 2022-2023 agreements. *Id.* ¶ 32. The prior version stated:

> INDEMNITY: Client [Kuchenbecker], on behalf of itself and its successors and assigns, agrees to indemnify and hold harmless [Golden], its owners, officers, directors, employees, agents, and other clients and their respective successors and assigns, with respect to any and all claims or demands of any character made against them by any non-party, arising out of [Golden's] performance herein, including without limitation any claim that [Golden]

---

[6] Because these agreements contain identical language, I will refer to them collectively as the 2022-2023 agency agreements. *Compare* Doc. 95-3 at 44, *with* Doc. 95-3 at 53.

was acting as a joint employer with Client, any claim arising from Client's breach of any term of this Agreement, or any claim of any violation or alleged violation of any law affecting Client's use of labor provided through [Golden's] efforts. Client agrees that it will notify and consult with [Golden] in the event of the assertion of any such claim.

*Id.* ¶ 33. The 2022-2023 version states:

INDEMNIFICATION. Client agrees to fully indemnify and hold harmless Agency, its owners, officers, directors, workers, agents, or affiliated entities, their respective successors and assigns for any actions, claims, demands or proceedings against Agency resulting out of or related to the Agency's services to Client as set forth in this Agreement, including, but not limited to, those resulting from the Client's failure to meet – or the violation of – any and all regulatory and legal requirements in connection with the hiring/labor/workers contemplated herein. The indemnity shall include, but not be limited to, any judgment, fines, charges, as well as attorney's fees and costs, which Agency incurs as the result of such claims or action. It is the intent of these provisions that Clients shall fully indemnify, protect and hold harmless Agency from any and all such claims.

*Id.* at 8 ¶ 34.

The 2022-2023 agreements describe the scope of work that Golden Opportunities would provide as follows:

Scope of Work. Agency shall assist Client in navigating and fulfilling the regulatory requirements in connection with the Client's worker needs for the use of legal, foreign nonimmigrant workers on a seasonal or temporary basis. Agency will prepare and process or assist in preparing or processing such forms, documentation and filing requirements of the regulatory agencies, including those under the H-2A Federal requirements and mandates, and shall further assist in the arrangements for recruiting and hiring domestic and legal foreign workers on Client's behalf in connection with its business operations. In connection therewith, Agency shall provide Client administrative support services related to the recruitment and maintenance of its seasonal and temporary workforce as contemplated in this Agreement. It is, however, acknowledged, consented and agreed that the Agency's services and responsibilities are limited to these purposes and do not extend to the Client's direct legal responsibilities and obligations as an employer, including any and all regulatory requirements, responsibilities

and practices under law, including, but not limited to, Federal and State labor and wage and hour laws...

*Id.* ¶ 35.

Under each agreement, defendants were required to provide accurate and complete information for visa applications. Doc. 100-3 at 7 ¶ 54. The agreements also required defendants to comply with the legal and regulatory requirements of the H-2A visa program. *Id.* ¶ 55. Finally, the agreements included a statement of some potential consequences of an employees' failure to comply with legal requirements. *Id.* ¶ 56.

Employers seeking to hire H-2A visa workers must submit an application for each "season" that it seeks to employ H-2A workers. Doc. 100-2 at 9 ¶ 38. An employer's work "season" cannot be longer than ten months. *Id.* ¶ 37. A "season" is defined by the employer in its H-2A application and describes the type of work that the employer needs the potential H-2A workers to perform. *Id.* ¶ 39. Golden Opportunities assists its clients with the H-2A visa process, including assisting KE and H&S with the process described above of applying for each "season."[7] *Id.* ¶ 40.

## C. *KE, Golden Opportunities and the H-2A Program*

KE was formed in the early 1990s and hauls chicken manure from commercial chicken lots to spread on fields. *Id.* ¶¶ 45, 46. KE first used Golden Opportunities to help it obtain H-2B[8] workers in 2016, after previously applying for H-2B visas without

---

[7] Defendants also discuss the "single employer test," which they argue the government may use to prevent employers from creating shell companies to circumvent H-2A visa requirements. Doc. 100-2 at 10-11 ¶¶ 41-44. Because this section intermingles legal arguments with factual findings, I will discuss the single employer test as it relates to my ultimate analysis of the parties' arguments.

[8] The H-2B visa program applies to non-agricultural jobs. *See H-2B Temporary Non-Agricultural Workers, U.S. CITIZENSHIP AND IMMIGRATION SERVICES,* https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-temporary-non-agricultural-workers (last updated July 1, 2025).

the help of Golden Opportunities. *Id.* at 12 ¶ 48. In 2016, in response to a questionnaire by Golden Opportunities, KE provided an H-2B application that it had filled out on its own, indicating that it was looking for assistance between April 2016 and February 2017. *Id.* at 11-12 ¶¶ 47, 49. The H-2B application also stated that during the "end of February to mid-April, we [KE] are in our downtime months." *Id.* at 12 ¶ 50. The H-2B application stated that KE needed workers to "Transport chicken manure in multiple worksites in Winnebago, Hancock, Humbolt, Kossuth counties in NW IA nonmetropolitan area & Cerro Gordo, Mitchell, Worth counties in NE IA nonmetropolitan area; begin Rake, Winnebago County, IA." *Id.* ¶ 51. Golden Opportunities also helped KE file an application for H-2A workers in June 2016. *Id.* ¶ 52. KE and Golden Opportunities signed their agency agreement on August 31, 2016. *Id.* ¶ 53.

KE's H-2A visa application stated that KE needed workers to "haul chicken manure from the chicken confinements and bunkers to the fields from October to August." *Id.* at 13 ¶ 54. It further contained an itinerary of worksites at which workers would spread manure, but did not explicitly state that workers would be travelling across northwest and northeast Iowa. *Id.*; Doc. 95-5 at 30.

Oosthuysen's report about the H-2A visa process with KE states:

> Based on the job duties and the fact that it is agricultural in nature and that the employer could file under the H-2AFLC to obtain H-2A workers, it makes no sense that they would have to continue filing for H2B workers. The employer filed with Golden to obtain H2B application in 2016 since they did not obtain the Farm Labor License (FLC) until later in 2016 and would not have been able to obtain H-2A approval without the license.

Doc. 100-2 at 13 ¶ 55. Oosthuysen testified that he did not "encourage [KE] or talk to [KE] about how the H-2A program might be more advantageous to them than the H-2B" because "back in 2016 it didn't matter. There wasn't such a demand for the H-2B as there is now, so there wouldn't have been a reason for [Golden Opportunities] to suggest that." *Id.* ¶ 56. Later, in an email to KE, Oosthuysen wrote:

10

[T]hings are not looking good for the H2B. We are still quite a ways out from your application going to the USDHS and the cap is pretty much met, I think they will close it next week so there will be no H2B's this year. We will need to consider doing another H2A.

*Id.* at 14 ¶ 57. After this point, KE filed only H-2A applications. *Id.* ¶ 58.

### D.  *The Formation of H&S*

Oosthuysen sent the email regarding the switch to the H-2A program on March 9, 2017, at which point H&S had not yet been formed. *Id.* ¶¶ 59, 60. On March 30, 2017, also before the formation of H&S, Oosthuysen emailed an "Employer application" to KE, stating, "Please complete with the information for HCS [sic] farms. We will need to make sure that Heather [Smidt] is the point of contact with her address as the mailing address and the worksite needs to be different than the address previously used." *Id.* ¶ 61. Oosthuysen testified that he has never met or spoken with Smidt and she agrees that she has never spoken with him. *Id.* at 15 ¶¶ 62, 63.

On May 17, 2017, Oosthuysen sent Kenny an email entitled "Job descriptions." *Id.* ¶ 64. The email included a job description that had previously been authored by Kenny's sister, Ruth Scholtz, without involvement from Golden Opportunities, that Oosthuysen thought could be helpful to defendants. Doc. 100-5 at 110-112. The email stated:

Here is the job description for K&S Cattle – you can modify this:

Assisting with winter livestock feeding supplements, minerals, breaking ice and snow removal; Using skid steer to clean and mowed manure from cattle pens; Maintenance and repairs to machinery and equipment; If driving trucks; Daily maintenance defenses, buildings, equipment and machinery. CDL is required or ability to obtain within 30 days of hire. Must be able to lift

Here is the Kuchenbecker Excavating job description. It should be different than this: We need seasonal help to all and spread chicken manure on fields. Employees will need to operate/run/maneuver/control trucks and large

11

tractors to haul and apply chicken manure as fertilizer to fields. Employees will perform various duties associated with applying fertilizers to fields, including the loading and unloading of chicken manure. Operate and monitor pumps. When application is complete the workers will pick up equipment, clean up work site and prepare to move equipment to next location. Employees will perform routine maintenance on equipment. Require a CDL or equivalent or be able to obtain CDL within 30 days to allow the driving of semi trucks. Must have experience with air brakes. Work outdoors, exposed to weather. Be able to lift 75 LB. Require three months experience and a high school diploma or GED.

Doc. 100-2 at 15-16 ¶ 65. K&S Cattle was an unincorporated business established in 2008 and owned by Kenny and Sara. *Id.* at 16 ¶ 66. Kenny testified that K&S was established for the use of H-2A workers. Doc. 100-3 at 1 ¶ 3. Ruth Scholtz's role in the business was assisting it with obtaining H-2A visas. Doc. 100-5 at 17. On May 19, 2017, two days after Oosthuysen's email to Kenny, H&S filed its Certificate of Organization with the Iowa Secretary of State. Doc. 100-2 at 16 ¶ 67.

### E. KE, H&S, Golden Opportunities and the H-2A Program

Defendants testified they founded H&S for the purpose of facilitating KE's use of H-2A workers and for estate planning purposes. Doc. 100-3 at 2 ¶¶ 10, 11. The name H&S comes from "Heather and Sara." *Id.* ¶ 12. Defendants made Smidt, the daughter of Kenny and Sara, an owner of H&S to keep Kenny's name off the company and make it appear separate from KE. *Id.* ¶ 13. During the relevant time period, Smidt signed documents relating to H&S at the direction of her mother, Sara, often without reading what she was signing. *Id.* ¶ 14. This included Smidt signing, without reading, H-2A visa applications under penalty of perjury, declaring she had "read and reviewed this clearance order, including every page of this Form ETA-790A and all supporting addendums, and that to the best of [her] knowledge, the information contained therein is true and accurate." *Id.* at 2-3 ¶ 15. Kayce Elwood, testifying as a corporate representative of H&S, described Smidt signing documents for H&S as follows: "[S]he

12

listened to her mom just saying, 'yes, sign this.'" *Id.* at 3 ¶ 16. The business operations of H&S were comingled with KE and there was no functional difference between the operations of the two businesses. *Id.* ¶ 17.

The Employer Application that H&S completed for Golden Opportunities was faxed on May 25, 2017, and included a request to "Describe the Job Duties to be Performed in Detail." Doc. 100-2 at 16-17 ¶ 68. H&S wrote: "Employees will need to safely and effectively operate semi-trucks and large trailers to load, transport, and haul feeding products and manure to different locations. Employees will also complete regular repairs and maintenance on trucks and equipment. Will work with livestock. Must be able to lift 75 pounds." *Id.* The application also identified H&S as a "new company." *Id.* at 17 ¶ 69. Heather was the point of contact on the application. *Id.* ¶ 70. The completed employer application stated that H&S wanted its workers to start on August 1, 2017, which was when KE's season was set to expire. *Id.* ¶ 71; Doc. 95-5 at 38. On June 1, 2017, H&S signed its first agency agreement with Golden Opportunities. Doc. 100-2 at 17 ¶ 72.

Beginning in 2018, Golden Opportunities assisted defendants with submitting their H-2A applications. *Id.* ¶ 73. Workers recruited through the program would transfer between H&S and KE during the year. *Id.* ¶ 75. For example, Oosthuysen emailed Sara: "[D]o you need me to do the August filing again [for H&S] so that we can transfer the guys over when they expire on Kuchenbecker Excavating? If so I will need to know soon so that I can send you the papers to sign." *Id.* KE and H&S were also covered by the same workers compensation insurance policy. *Id.* ¶ 76. Workers compensation insurance is required for employers under the H-2A program. *Id.* ¶ 77.

In 2021, Elwood forwarded an email to Oosthuysen from the insurance carrier, in which Kayce was informed that she had "listed both [KE and H&S] this time as they are both named insureds on the policy." *Id.* at 19 ¶ 78. Elwood asked Oosthuysen if that would be "ok for work comp cert of coverage for H&S Farms?" *Id.* ¶ 79. Oosthuysen replied: "We really should not have Kuchenbecker listed on there. They will be a red

13

flag and if they see this as one company, we will have issues when we file Kuchenbecker." *Id.* ¶ 80. In response to a question about this email during his deposition, Oosthuysen testified: "That's taking an email and trying to prove something that's not true. So, I mean, if that's all you got, go for it, because I can tell you that's not me telling that I knew they were defrauding the U.S. government." Doc. 95-3 at 23.

Oosthuysen further testified that he had never seen any of the workers compensation insurance forms that showed identical policy numbers for KE and H&S, stating, "[i]f that is the workman's comp they provided, that would have been the one that would have been uploaded for that season to the Department of Labor system." *Id.* at 16-17. Oosthuysen also testified that he did not know that KE and H&S operated as a single business, that neither he nor Golden Opportunities had ever advised a client to create a separate employer legal entity and that Golden Opportunities did not advise defendants to create H&S. Doc. 100-3 at 7 ¶¶ 57-59.

KE and H&S maintained separate accounting, had separate bank accounts and filed separate tax returns. *Id.* ¶ 60. H&S paid Golden Opportunities from its separate checking account. *Id.* ¶ 61. According to Oosthuysen, Golden Opportunities relied on information supplied by defendants when assisting with their H-2A applications. *Id.* ¶ 62. Golden Opportunities solicited updates every year before the submission of additional H-2A applications. *Id.* at 8 ¶ 63. Every year, agents of KE and H&S signed, under penalty of perjury, certifications stating the information contained in the H-2A applications was accurate to the best of their knowledge. *Id.* ¶ 64. Oosthuysen testified that Golden Opportunities rarely visits work sites or housing for H-2A workers because of the distance, time and expense of doing so, and because Golden Opportunities is "not the enforcer of the program." *Id.* ¶ 66; Doc. 100-5 at 108-09.

Oosthuysen further testified that it is common and permissible for H-2A workers to transfer between employers, or even between approved labor certifications with the same employer. Doc. 100-3 at 8 ¶ 67. He explained his understanding that if H&S had operated separately, and had its employees been assigned only approved duties, there

14

would be no illegality in the transfer of H-2A workers between KE and H&S. *Id.* ¶ 68. Finally, Oosthuysen believes the creation of H&S conferred no legal benefit to defendants, as KE could have submitted the same H-2A applications for the livestock season that defendants instead filed under H&S. *Id.* ¶ 69.

By no later than 2021, defendants were aware H-2A workers could not be assigned duties not included in the visa application job descriptions. Doc. 100-3 at 3 ¶ 18. In a February 5, 2021, email regarding an H-2A application for a South African employee, Oosthuysen emailed Elwood: "This looks good. I would maybe remove the picture of the equipment on top since that does not support the hauling of manure, etc. Better not to create confusion." Doc. 95-3 at 73. Oosthuysen gave the following testimony about this email:

> [T]his letter was sent during COVID. During COVID there was a ban for anybody flying in from South Africa on the -- because of COVID restrictions. And in order to get a visa approved in South Africa, employers had to request a variance and an approval for any visas to show that it was related -- there was a need, an agricultural need, and that's why they got an exception to get an H-2A visa to come in during that time.
>
> So the email she had to write in support of Carlo Claassen was to the U.S. consulate in South Africa to request that they approve his exemption. So my suggestion was simply to take the picture out because it has nothing to do with the request on the job description.
>
> She put an excavator picture in there, which the job description obviously is manure hauling, and they're asking for an agricultural exemption. And for the consulate, not to create confusion, it would make no sense to put an excavator in this.
>
> Would it have been any denial on the letter, no, probably not, but it was just my opinion that an excavator on an ag letter does not make sense. It has nothing to do with the H-2A program. It was to make sure that Claassen will get his H-2A visa that was already approved.

Doc. 100-5 at 132-33.

15

Another requirement of the H-2A visa program is approved housing. Doc. 100-2 at 20 ¶ 85. In discussing housing information with Sara, Oosthuysen emailed:

> Per our phone conversation I know you acknowledged that you are aware that housing cannot be changed once certified and guys cannot move between housing or stay in different housing than what is listed on the application...

> Housing for Kuchenbecker excavating is:

> 1) 101 First St. NE, Rake, IA, 50465

> 2) 219 N Circle Drive, Blue Earth, MN, 56013 Housing for H&S Farms – Livestock

> 1) 203 Grace St., Rake, IA 50465

> 2) 36615 30th St., Elmore, MN 56027

*Id.* at 21-22 ¶ 86. Oosthuysen testified that he could not recall why he emailed Sara about the two companies at once, stating, "I don't recall what caused that response, but it was obviously clarifying what housing H-2A workers can stay in when they're on Kuchenbecker Excavating versus H&S, since there are different filings and different approved housing." *Id.* ¶ 87; Doc. 95-3 at 20.

Golden Opportunities charged fees for the work it performed in assisting KE and H&S with the H-2A process. Doc. 100-2 at 21 ¶ 88. Oosthuysen would send Golden Opportunities' invoices for both KE and H&S to the same email addresses, namely Sara or Kenny's address. *Id.* ¶ 89. At times, this confused Sara, who emailed Oosthuysen, "is my invoice for 3960.00 for H&S or Kuchenbecker Want to send check from correct account." *Id.* at 22 ¶ 90. Oosthuysen responded: "It is for H&S. I apologize, I thought you would want to pay it out of Kuchenbecker." *Id.* ¶ 91.

Oosthuysen had only one in-person meeting with Sara and Kenny, otherwise communicating by email or telephone, which he testified is his custom with most clients. Doc. 95-3 at 8-10. Smidt never had any contact with Oosthuysen. Doc. 100-2 at 22 ¶

94. Smidt testified that Kenny and Sara were told by Golden Opportunities "that to be able to keep their workers year-round to have another business that did not have the same address as [KE] and was not owned by Kenneth Kuchenbecker. So we– or I should say mom and dad put it at my house address and then I was part owner." *Id.* at 22-23 ¶ 95. Kenny testified that Oosthuysen told him to set up a second entity, although he seemed to be confused during this portion of the deposition and testified that this second entity was K&S Cattle, which was formed in 2008 before Golden Opportunities began working with KE. *See* Doc. 100-5 at 13-22; Doc. 100-3 at 1-2 ¶¶ 5-6. In fact, Oosthuysen did not begin working for Golden Opportunities until 2009. Doc. 100-3 at 2 ¶ 7.

Sara testified that when KE started the H-2A process, she and Kenny knew nothing about it, and thus relied on the advice they were given. Doc. 100-2 at 23 ¶ 97. She does not recall whether that advice came from Oosthuysen or someone else at Golden Opportunities. *Id.* In general, KE and H&S employees could not provide any specific recollections about Golden Opportunities' alleged direction of the creation of H&S in their testimony. *See* Doc. 100-3 at 4-5 ¶¶ 30-37. Sara testified that the advice was given to establish H&S "so we could transfer our employees [sic] so they could stay. Because most of our employees wanted to stay, and this way they would." *Id.* at 24 ¶ 98. However, Sara could not remember how Golden Opportunities directed the creation of H&S, just that "[w]e didn't have any idea how to run these companies without [Golden Opportunities'] knowledge." Doc. 100-8 at 57.

### F.     Alleged H-2A Program Violations and Golden Opportunities' Role

Hanekom worked for defendants from July 2021 to July 2023. Doc. 100-3 at 2 ¶ 8. His amended complaint in this case alleged a visa fraud scheme enacted by defendants and Golden Opportunities. *Id.* ¶ 9. During their time using the H-2A visa program, defendants assigned duties outside the approved job descriptions to their H-2A workers because "the guys want to work." *Id.* at 3 ¶ 19. Defendants knew H-2A workers could not be directed to stay in hotels instead of approved housing locations. *Id.* ¶ 20. Golden

17

Opportunities informed them of this regulation on multiple occasions. *Id.* Despite this, defendants continued having their H-2A workers stay in hotels. *Id.* ¶ 21. Defendants made the H-2A workers stay in hotels "[b]ecause it would be cheaper to do it that way, to put them in a hotel instead of driving all the way back" to the approved housing. *Id.* ¶ 22. Despite not being included in the approved job descriptions, defendants assigned long-distance trucking duties to their H-2A workers. *Id.* ¶ 23. Defendants paid Hanekom less than was required by law for long-distance trucking duties. *Id.* ¶ 25.

Throughout Golden Opportunities' partnership with defendants, Oosthuysen provided guidance about H-2A requirements. For example, in 2018 he advised Kenny and Sara that H-2A workers could not stay in nonapproved housing. *Id.* at 4 ¶ 26. In 2021, upon hearing a rumor of potential wrongdoing, Oosthuysen advised Elwood that H-2A workers could not stay at hotels, work at unapproved locations or be assigned duties outside the approved job descriptions. *Id.* ¶ 27. Oosthuysen testified that he did not know if the rumor was true, or if defendants were actually engaging in the unlawful conduct, but he contacted Elwood to ensure defendants were aware of the legal requirements. *Id.* ¶ 28. Testifying as a corporate representative of KE, Elwood acknowledged she did not have any reason to believe Golden Opportunities was aware that KE's H-2A workers were assigned duties outside of the approved job descriptions. *Id.* ¶ 29.

Elwood and Sara both testified about their positive impressions of Golden Opportunities. *Id.* at 6 ¶¶ 50-52. Sara further testified that she never believed Golden Opportunities was advising KE to do anything illegal. *Id.* at 7 ¶ 53.

## V.      ANALYSIS

### A.      Count 1 – Indemnification

Defendants argue that they are entitled to summary judgment on the indemnification claim for three separate reasons.  First, they argue that the indemnity clause does not apply to this case.  Doc. 95-2 at 14-19.  Second, they argue that the indemnification clause does not indemnify Golden Opportunities' own negligence.  *Id.* at 20-21.  Third, they argue that enforcing the indemnification agreement under these circumstances would violate public policy.  *Id.* at 21-23.  I will address each in turn.

#### 1.      Does the indemnity clause apply to this case?

Defendants argue that the narrowed provisions of the 2022-2023 agency agreements preclude indemnification for claims brought by employees.  *Id.* at 15-17.  They also argue that there can be no indemnification because the claim did not arise out of or relate to "services" performed by Golden Opportunities.  *Id.* at 17-20.

Regarding the 2022-2023 agency agreements, defendants point to changes that removed reference to indemnification for "any and all claims or demands of any character made against them by any non-party" and "alleged violations" "of any law affecting Client's use of labor provided by" Golden Opportunities, substituted with language stating:

> Client agrees to fully indemnify and hold harmless Agency, its owners, officers, directors, workers, agents, or affiliated entities, their respective successors and assigns for any actions, claims, demands or proceedings against Agency resulting out of or related to the Agency's services to Client as set forth in this Agreement, including, but not limited to, those resulting from the Client's failure to meet – or the violation of – any and all regulatory and legal requirements in connection with the hiring/labor/workers contemplated herein. The indemnity shall include, but not limited to, any judgment, fines, charges, as well as attorney's fees and costs, which Agency incurs as the result of such claims or action. It is the intent of these provisions that Clients shall fully indemnify, protect and hold harmless Agency from any and all such claims.

*Id.* at 15-16; Doc. 100-2 at 8 ¶ 34. Defendants argue that these changes reflect an intent by the parties to limit indemnity to situations involving claims brought by the Department of Labor or other regulatory bodies and not claims brought by employees, such as Hanekom. Doc. 95-2 at 15-16.

The problem with this argument is that it relies on evidence extrinsic to curtail the terms of the 2022-2023 agency agreements. As Tennessee[9] courts have explained:

> In applying the appropriate standard of interpretation even to an agreement that on its face is free from ambiguity it is permissible to consider the situation of the parties and the accompanying circumstances at the time it was entered into—**not for the purpose of** modifying or enlarging or **curtailing its terms**, but to aid in determining the meaning to be given to the agreement.

*Hamblen County v. City of Morristown,* 656 S.W.2d 331, 334 (Tenn. 1983) (quoting Restatement of Contracts, § 235(d)) (emphasis added); *see also Hines v. Wilcox,* 96 Tenn. 148, 33 S.W. 914, 914-15 (1896) ("The general rule is that parol evidence is not admissible to contradict a written agreement, whether simple or by deed … But this rule does not apply in cases where the parol evidence in no way contradicts or alters the terms of the written contract, but tends to establish an independent or collateral agreement not in conflict with it."). Defendants contend that they are using this extrinsic evidence merely "as an aid in the construction of the contract's language." Doc. 95-2 at 15. I disagree. The 2022-2023 agreements unambiguously state that Golden Opportunities is entitled to be indemnified for the following:

> [A]ny actions, claims, demands or proceedings against Agency resulting out of or related to the Agency's services to Client as set forth in this Agreement, including, but not limited to, those resulting from the Client's failure to meet – or the violation of – any and all regulatory and legal requirements in connection with the hiring/labor/workers contemplated herein. The indemnity shall include, but not be limited to, any judgment,

---

[9] The parties agree that Tennessee law applies to this case based on their contractual choice of law provision. *See* Doc. 95-2 at 14; Doc. 100-1 at 8.

> fines, charges, as well as attorney's fees and costs, which Agency incurs as
> the result of such claims or action.

Doc. 100-2 at 8 ¶ 34.  Contrary to defendants' argument, this language is broad and does not require extrinsic evidence to interpret.  Rather, it encompasses exactly the type of claim that Hanekom brought by referencing "any actions, claims, demands or proceedings" that result from defendants' alleged failure to meet, or violation of, regulatory and legal requirements in connection with his hiring.  It would be unreasonable to read the phrase "any actions, claims, demands or proceedings" to exclude such a large category of claims as those that private parties may bring.  The inclusion of language referencing "judgments" also militates against an intent for the contract to preclude any actions other than those brought by regulatory bodies.  As defendants concede, judgments encompass civil actions like the one Hanekom brought:  a lawsuit resulting from defendants' and Golden Opportunities' alleged violation of H-2A visa program requirements.  *See* Doc. 95-2 at 17.  Defendants' argument that the indemnity clause does not cover claims brought by employees fails.

Next, defendants argue that the indemnification clause does not apply because Hanekom's claims do not arise from "services" performed by Golden Opportunities under the 2022-2023 agency agreements.  *Id*.  Those agreements contain a "Scope of Work" section that states:

> Agency shall assist Client in navigating and fulfilling the regulatory requirements in connections with the Client's worker needs for the use of legal, foreign nonimmigrant workers on a seasonal or temporary basis...It is, however, acknowledged, consented and agreed that the Agency's services and responsibilities are limited to these purposes and do not extend to the Client's direct legal responsibilities and obligations as an employer, including any and all regulatory requirements, responsibilities, and practices under law, including, but not limited to, Federal and State labor and wage and hour laws.

Doc. 100-2 at 8 ¶ 35.  Defendants argue that Golden Opportunities actually assisted them with circumventing regulatory requirements, which cannot constitute a service because this assistance aided in an illegal purpose.  Doc. 95-2 at 17-20.

Viewing the facts in the light most favorable to Golden Opportunities, this argument fails.  The jury could find that Golden Opportunities procured "services" that aided in navigating around legal requirements.  However, the jury could also reasonably find that Golden Opportunities performed the services properly, without any illegal purpose, and was kept in the dark about defendants' allegedly fraudulent scheme.

The crux of defendants' argument is that Golden Opportunities, through Oosthuysen, pushed defendants to form H&S as a sham corporation to circumvent H-2A visa requirements.  *See* Doc. 95-2 at 18.  However, Oosthuysen testified that he did not know that KE and H&S operated as a single business, that neither he nor Golden Opportunities had ever advised a client to create a separate employer legal entity and that Golden Opportunities did not advise defendants to create H&S.  Doc. 100-3 at 7 ¶¶ 57-59.  Kenny testified that Oosthuysen told him to form a second entity, but that entity was K&S Cattle, which was formed years before any partnership with Golden Opportunities and even before Oosthuysen worked for Golden Opportunities.  Doc. 100-5 at 13-22; Doc. 100-3 at 1-2 ¶¶ 5-6.  The murkiness surrounding the formation of H&S, even from defendants themselves, shows that significant disputed facts remain on this issue.

Defendants also discuss "the single employer test" in their arguments related to the formation of H&S, and how Oosthuysen should have known that the two entities were essentially the same, thus alerting him to illegal activity.  Doc. 95-2 at 18.  However, Golden Opportunities argues that the creation of H&S did not confer any legal benefit on defendants, as a single employer may submit multiple H-2A applications if those

22

applications are for different "seasons."  Doc. 100-1 at 16; Doc. 100-3 at 8 ¶ 69.[10]  I agree.  The formation of H&S alone does not establish fraudulent activity, any more so than does KE submitting H-2A visa applications for multiple seasons.  As such, I need not discuss the single employer test at length.

The real issue is how the formation of H&S relates to any purported efforts by the parties to circumvent H-2A regulations.  On this issue, significant facts remain in dispute for the jury to resolve.  For example, KE and H&S maintained separate accounts and H&S paid Golden Opportunities from a separate checking account.  Doc. 100-3 at 7 ¶ 60.  Defendants certified under penalty of perjury, certifications that the information contained in the H-2A applications was accurate to the best of their knowledge.  *Id.* ¶ 64.  The jury could find that Oosthuysen was justified in relying on these certifications and believed that KE and H&S were hiring employees for different valid seasons. The jury could further reasonably believe Oosthuysen's testimony that Golden Opportunities does not regularly check on its H-2A work sites because it is "not the enforcer of the program," and that Oosthuysen reasonably relied on defendants' H-2A visa applications in concluding that their use of the program was legal.  *Id.* ¶¶ 66-68.

In sum, significant facts remain in dispute as to whether Golden Opportunities properly advised defendants of the legal requirements of the H-2A visa program.  I cannot find, as a matter of law, that Golden Opportunities merely aided in an illegal scheme instead of providing legitimate services.  Because reasonable jurors could find that Hanekom's claim related to services performed by Golden Opportunities, defendants' argument fails.

---

[10] *See also* H-2A Temporary Agricultural Workers, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2a-temporary-agricultural-workers (last updated Jan. 17, 2025).

### 2. Does Golden Opportunities' own negligence bar application of the indemnity clause?

Defendants next argue that the indemnity clause does not apply because it does not cover Golden Opportunities' own negligence. "Under the law of Tennessee an indemnity agreement does not indemnify the indemnitee's own negligence unless it is clear and unambiguous from the language of the contract that this was the intention of the parties." *Amerco Marketing Co. of Memphis, Inc. v. Myers,* 494 F. 2d 904, 913-14 (6th Cir. 1974).

Significant disputed facts prevent a finding that Golden Opportunities was negligent as a matter of law. As discussed above, reasonable jurors could find that Golden Opportunities was unaware of any fraud in defendants' H-2A visa applications. Further, Golden Opportunities addressed a rumor about defendants' alleged H-2A non-compliance with defendants. 100-3 at 4 ¶ 27. The jury could find that addressing this rumor is evidence of Golden Opportunities' intent to act lawfully throughout their partnership with defendants. Defendants' own statements praising Golden Opportunities further undercut their claim that Golden Opportunities performed negligently. *See* Doc. 100-3 at 6 ¶¶ 50-52. Finally, as noted above, even if Golden Opportunities played a role in forming H&S (which is not clear from the record) defendants' use of the H-2A program would have been lawful had they assigned the workers to jobs that matched the descriptions they submitted in their H-2A visa applications.

In sum, the record does not support a finding that Golden Opportunities was negligent as a matter of law. Defendants' argument to the contrary fails.

### 3. Is the indemnity clause unenforceable as a matter of public policy?

Defendants argue that enforcing the indemnification agreement under these circumstances would violate public policy. Doc. 95-2 at 21. They point to Tennessee law providing that "[a] private contract violates public policy if it conflicts with the constitution, statutes, or judicial decisions of this state or tends to be harmful to the public

24

good, public interest, or public welfare." *Copeland v. Healthsouth/Methodist Rehabilitation Hospital, LP,* 565 S.W. 3d 260, 275 (Tenn. 2018). Defendants further state that "other jurisdictions have held that misconduct of the indemnitee will invalidate an indemnification agreement when the misconduct is intentional, willful, or wanton." Doc. 95-2 at 22-23 (citing *In Re RFC and RESCAP Liquidating Trust Action,* 332 F. Supp. 3d 1101, 1134 (D. Minn. 2018)). Finally, defendants cite law concerning exculpatory agreements that does not permit parties to except themselves from "liability for gross negligence, reckless conduct, or intentional wrongdoing." *Copeland,* 565 S.W. 3d at 275.

This argument fails for the same reasons as the arguments addressed above. There are genuine disputes of material fact that preclude a finding that enforcing this indemnity clause would violate public policy as a matter of law. The jury could reasonably find that Golden Opportunities did not assist defendants in navigating around regulatory requirements and did not possess knowledge of any alleged fraud. Reconciling the parties' differing versions of the facts is for the jury. I am unable to find as a matter of law that Golden Opportunities behaved recklessly or with gross negligence. Thus, defendants' argument that the indemnity clause is unenforceable for public policy reasons fails.

Because each of defendants' arguments for summary judgment on the indemnity claim fail, they are not entitled to summary judgment on that claim.

**B.    Count 2 – Breach of Contract**

Defendants only briefly address the breach of contract claim, arguing that "[w]ithout the claim for indemnification, Golden's claim for breach of contract fails as a matter of law as they state no damages outside of their claim for reimbursement pursuant to the indemnification clause." Doc. 95-2 at 23-24. Because I have denied the motion for summary judgment on the indemnity claim, Golden Opportunities has a viable claim

25

for damages.  Defendants are not entitled to summary judgment on the breach of contract claim.

## VI.    CONCLUSION

For the reasons set forth herein, the motion (Doc. 95) for partial summary judgment filed by Kuchenbecker Excavating, Inc., and H&S Farms – Livestock, LLC, is **denied in its entirety**.

**IT IS SO ORDERED** this 20th day of August, 2025.

_____
Leonard T. Strand
United States District Judge